UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

FIRST FLIGHT LIMITED PARTNERSHIP,

Plaintiff/Counterclaim Defendant,

v.

ALLIANCE TECHNOLOGY GROUP, LLC,

Defendant/Counterclaim Plaintiff.

Civil Action No. TDC-18-0720

MEMORANDUM OPINION

Plaintiff First Flight Limited Partnership ("First Flight") filed this civil action against Defendant Alliance Technology Group, LLC ("Alliance") for breach of contract arising out of a lease agreement for commercial space in Hagerstown, Maryland. In turn, Alliance filed counterclaims for indemnification, recoupment, set-off, detrimental reliance, and unjust enrichment. Pending before the Court is Defendant's Motion for Partial Summary Judgment in which it seeks summary judgment on First Flight's claim and three of Alliance's counterclaims. Having reviewed the submitted materials, the Court finds that no hearing is necessary. *See* D. Md. Local R. 105.6. For the reasons set forth below, Alliance's Motion will be GRANTED IN PART and DENIED IN PART.

BACKGROUND

First Flight, a Virginia limited partnership with its principal place of business in Chantilly, Virginia, is under the control of Barrie Peterson, who owns 98 percent of the company. In 2012, First Flight owned a large warehouse space, formerly used for manufacturing aircraft, within the Topflight Air Park in Hagerstown, Maryland ("the Hagerstown Property").

Peterson also controlled, and was the president of, another entity known as Marble Mountain OC, LLC ("MMOC"). Peterson created MMOC as part of an effort beginning in 2012 to secure a government contract with the Defense Information Systems Agency ("DISA"), a component of the United States Department of Defense, to store electronic data, including classified information, at the Hagerstown Property. These efforts included a teaming agreement with Alliance under which Alliance would lease the Hagerstown Property to use for data storage to meet the requirements of a DISA contract. In that time frame, First Flight was seeking to refinance a loan on the Hagerstown Property. During discussions with M&T Bank, Peterson stated that Alliance would be leasing the Property. At that time, M&T deemed Alliance to be a more creditworthy lessee for the Hagerstown Property than MMOC, and it expressed its desire for First Flight to enter into a lease with Alliance.

## I. The Lease

On or about October 3, 2013, First Flight and Alliance entered into a lease agreement under which Alliance would lease the Hagerstown Property ("the Lease"). The Lease was for a term of three years, from October 15, 2013 to October 15, 2016, at a monthly rent of $100,000. The Lease provided that "[a]ny monthly installment of Basic Rent not paid within ten (10) days of the due date shall be subject to a late charge of five percent[.]" Lease ¶ 2.1(c), Mot. Summ. J. Ex. 8, ECF No. 174-13. The Lease also stated that Alliance would not sublet the Hagerstown Property or transfer, assign, mortgage, or encumber the Lease without the prior written consent of First Flight. *Id.* ¶ 3.8(a). The Lease included a provision entitled "Entire Agreement" stating that "this Lease contains all the agreements and conditions made between the parties hereto and may not be modified orally or in any other manner than by agreement in writing, signed by all parties hereto,

2

or their respective successors and interests. Any intention to create a joint venture or partnership relation between the parties hereto is expressly disclaimed." *Id.* ¶ 9.13.

In submitting the Lease as an exhibit to its memorandum in opposition to the Motion, First Flight appended a "Tenant's Agreement," signed by Alliance only and dated with an unspecified date in September 2013, which stated that it was "for the benefit of M&T Bank," and that it was entered into to satisfy M&T Bank's requirement "as a condition of its loan" to First Flight that Alliance subordinate its rights in the Hagerstown Property under the Lease to M&T Bank's rights. Tenant's Agreement at 1, Opp'n Mot. Summ. J. Ex. 4, ECF No. 177-4. In the Tenant's Agreement, Alliance stated in part that there had "been no modifications of the Lease," that First Flight was "not in default" under the Lease, and that Alliance had "no defense, set-off or counterclaim against [First Flight] under the lease or otherwise." *Id.* ¶ 2.

## II. The Business Agreement

In the months preceding the execution of the Lease, First Flight, MMOC, and Alliance were also negotiating a separate letter agreement relating to the efforts to secure a contract from DISA for data storage at the Hagerstown Property ("the DISA contract"), including a possible sublease of the Hagerstown Property by MMOC ("the Business Agreement"). On October 3, 2013, the same date that the Lease was signed, these parties executed the Business Agreement. The terms of the Business Agreement included that (1) Alliance agreed to execute a Lease for the Hagerstown Property; (2) Alliance agreed to pay First Flight $100,000 per month pursuant to the Lease; (3) MMOC, in exchange for its participation in the DISA contract opportunity, agreed to pay Alliance $100,000 per month within five days of Alliance's payment of the amount it owed under the Lease; (4) upon award of the DISA contract, MMOC agreed to sublease the Hagerstown Property in order to provide the space to fulfill the DISA contract and would then stop making the

$100,000 payments; and (5) upon award of the DISA contract, Alliance would pay MMOC $120,000 per month until the storage capacity at the Hagerstown Property reached a certain level.

The Business Agreement also provided, however, that if Alliance did not receive the DISA contract within three months of the date of the Business Agreement and the Lease, it would continue to make the $100,000 lease payments and MMOC would continue to make the corresponding $100,000 payments, while First Flight would seek to find subtenants for some or all of the Hagerstown Property. Notably, the Business Agreement included a provision stating that "[First Flight] agrees to indemnify Alliance for the total amount of unpaid Lease payments due in the event that Alliance is in breach of the Lease due to nonpayment of rents" ("the Indemnification Clause"). Business Agreement at 2, Mot. Summ. J. Ex. 9, ECF No. 174-14. The Business Agreement also stated that "the terms and conditions of this letter shall remain in effect throughout the life of the lease or until such time as the parties determine to alter or terminate the terms of this letter as evidenced by an agreement reduced to writing and executed by both parties." *Id.* at 1.

According to Hugh V. Hayes, an Executive Vice President of Alliance, Alliance entered into the Lease to allow First Flight to show that it was receiving rental income on the Hagerstown Property in order to secure the refinancing from M&T Bank, but that pursuant to the Indemnification Clause, Alliance was not actually responsible for the lease payments. Hayes asserts that the Indemnification Clause was important to Alliance because there was no certainty that Alliance would receive the DISA contract, so it needed First Flight and MMOC to bear some of that risk by agreeing that it would not be responsible for the rent unless or until a government contract was secured.

In February 2014, Alliance secured the DISA contract. However, the revenue from the contract proved to be substantially less than expected. In March 2015, MMOC terminated its

4

subcontract with Alliance, and First Flight demanded that Alliance remove its equipment from the Hagerstown Property. According to Peterson, Alliance owes First Flight for unpaid rent from April 2015 forward.

### III. Procedural History

On January 2, 2018, First Flight filed its Complaint against Alliance alleging one count of breach of contract based on the claim that Alliance did not make all payments due under the Lease. On January 28, 2019, Alliance filed an Amended Answer and Counterclaim in which it asserts counterclaims in the following numbered counts: (1) contractual indemnification; (2) recoupment; (3) set-off; (4) detrimental reliance; and (5) unjust enrichment.

## DISCUSSION

In its Motion for Partial Summary Judgment, Alliance seeks summary judgment on its counterclaims for indemnification, recoupment, and set-off on the grounds that under the plain language of the Indemnification Clause of the Business Agreement, it is not responsible for any unpaid amounts allegedly owed under the Lease. In turn, Alliance argues that it is also entitled to summary judgment on First Flight's breach of contract claim, because if it prevails on the counterclaims, that claim necessarily fails.

### I. Legal Standards

#### A. Motion for Summary Judgment

Under Federal Rule of Civil Procedure 56(a), the Court grants summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In assessing the Motion, the Court views the facts in the light most favorable to the nonmoving party, with all justifiable inferences drawn in its favor. *Anderson*

*v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The Court may rely only on facts supported in the record, not simply assertions in the pleadings. *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. A dispute of material fact is "genuine" only if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Id.* at 248-49.

## B.     Contract Interpretation

Alliance's arguments for summary judgment rest on the proper interpretations of the Lease and the Business Agreement, including how they can or should be reconciled. "As a fundamental principle of contract construction, [courts] seek to ascertain and effectuate the intention of the contracting parties." *Maslow v. Vanguri*, 896 A.2d 408, 419 (Md. Ct. Spec. App. 2006) (quoting *Mercy Med. Center, Inc. v. United Healthcare of the Mid–Atlantic*, 815 A.2d 886, 908 (Md. Ct. Spec. App. 2003)). To ascertain the parties' intent, courts in Maryland "have long adhered to the objective theory of contract interpretation, giving effect to the clear terms of agreements, regardless of the intent of the parties at the time of contract formation." *Myers v. Kayhoe*, 892 A.2d 520, 526 (Md. 2006). Contractual intent is determined in accordance with what a reasonable person in the position of the parties would have meant at the time it was effectuated." *Id.* (quoting *Dennis v. Fire & Police Employees Ret. Sys.*, 890 A.2d 737, 747 (Md. 2006)). Thus, when a contract has a "clear, unambiguous, and definite understanding ... its construction is for the court to determine." *Wells v. Chevy Chase Bank, F.S.B.*, 768 A.2d 620, 630 (Md. 2001).

A contract is ambiguous "if, when read by a reasonably prudent person, it is susceptible of more than one meaning." *Calomiris v. Woods*, 727 A.2d 358, 363 (Md. 1999). If a trial court finds that a contract is ambiguous, it may receive parol evidence to clarify the meaning. *See id.*

However, "extrinsic evidence admitted must help interpret the ambiguous language and not be used to contradict other, unambiguous language in the contract." *Id.* at 366.

A contract is construed "as a whole to determine the parties' intentions." *Sullins v. Allstate Ins. Co.*, 667 A.2d 617, 619 (Md. 1995). In interpreting contracts, Maryland law generally "bars the admission of prior or contemporaneous agreements or negotiations to vary or contradict a written contractual term." *Calomiris*, 727 A.2d at 361 (quoting *Equitable Trust Co. v. Imbesi*, 412 A.2d 96, 107 (Md. 1980)).

## II.   Indemnification

Alliance argues that, as asserted in Count 1 of the Counterclaim, under the plain language of the Indemnification Clause, First Flight has agreed to indemnify Alliance for any unpaid lease payments. The relevant provision states that "Lessor agrees to indemnify Alliance for the total amount of unpaid Lease payments due in the event that Alliance is in breach of the Lease due to nonpayment of rents." Business Agreement at 2. Courts "construe the language of an indemnification provision in accordance with its customary, ordinary, and accepted meaning." *Steamfitters Local Union No. 602 v. Erie Insurance Exchange*, 233 A.3d 59, 85 (Md. 2020). Where the Indemnification Clause plainly requires First Flight to indemnify Alliance for any unpaid lease payments, Alliance argues that First Flight's claim for breach of contract arising from unpaid lease payments effectively fails because any such payments are covered by the Indemnification Clause.

In response, First Flight primarily argues that the Indemnification Clause has no effect because the Lease contained an integration clause that states, "this Lease contains all the agreements and conditions made between the parties hereto and may not be modified orally or in any other manner than by agreement in writing, signed by all parties hereto, or their respective

7

successors and interests" ("the Integration Clause"). Lease ¶ 9.13, Opp'n Ex. 4, ECF No. 177-4. Under Maryland law, an integration clause is "not invariably conclusive, and its coverage is a matter of interpretation." *Shoreham Developers, Inc. v. Randolph Hills, Inc.*, 235 A.2d 735, 739 (Md. 1967) (finding that a clause stating that "[t]his contract contains the final and entire Agreement between the parties" was not conclusive because the parties did not intend for that contract to be considered alone). Thus, "the presence of an express integration clause does not automatically resolve the parties' actual intention regarding integration" and "may be subject to further interpretation." *Jaguar Land Rover N. Am., LLC v. Manhattan Imported Cars, Inc.*, 477 F. App'x 84, 88 (4th Cir. 2012). Moreover, where "several instruments are made a part of a single transaction they will all be read and construed together as evidencing the intention of the parties in regard to the single transaction even though the instruments were executed at different times and do not in terms refer to each other." *Rocks v. Brosius*, 217 A.2d 531, 545 (Md. 1966); *Jaguar Land Rover*, 477 F. App'x at 88.

In *Jaguar Land Rover*, there were three agreements at issue: a letter of intent, a performance agreement, and a dealer agreement between Jaguar Land Rover ("JLR") and its franchisee, Manhattan Imported Cars, Inc. ("Manhattan"), and the dealer agreement was the last of the three to be signed and included an integration clause. *Jaguar Land Rover*, 477 F. App'x at 89. In finding that the integration clause in the dealer agreement did not cancel or supersede the letter of intent or performance agreement, the Fourth Circuit found that the three agreements were submitted to one of the parties as a "package" in a single email transmission. *Id.* Thus, although the parties "executed the letter of intent and the performance agreement two weeks before executing the Land Rover dealer agreement, all three agreements were required to be completed before Manhattan was authorized to begin operating the Land Rover dealership," such that "the

8

parties treated the agreements as being part of a single transaction." *Id.* This conclusion was "reinforced" by Manhattan's conduct because despite the integration clause, it acted in a manner that demonstrated that it intended for all three agreements to "be construed and enforced together." *Id.* Moreover, the court also relied on the fact that:

> [T]he terms of the Land Rover dealer agreement did not contradict, vary, or amend any of the terms in the letter of intent or the performance agreement. The letter of intent and the performance agreement, among other things, set forth requirements for the improvement and renovation of the Rockville facility after the addition of the Land Rover dealership, while the Land Rover dealer agreement did not address this subject. Rather, the Land Rover dealer agreement addressed the franchisor-franchisee relationship between JLR and Manhattan, which permitted Manhattan to operate as a Land Rover dealer.

*Id.* at 88-89.

Here, as in *Jaguar Land Rover*, the record reflects that the Lease and the Business Agreement were negotiated in the same time frame and were contemplated to be considered together, and the final signatures on both the Business Agreement and the Lease were secured, and the final versions were transmitted, on October 3, 2013. Significantly, the Business Agreement contains specific language which must be considered alongside the Lease's Integration Clause. Specifically, the Business Agreement makes clear an intention for its terms to be considered along with those of the Lease when it states that "this letter shall set out the agreement . . . in regard to the lease signed between the two parties on October 2, 2013," and that "[t]he terms and conditions of this letter shall remain in effect throughout the life of the lease or until such time as the parties determine to alter or terminate the terms of this letter as evidenced by an agreement reduced to writing and executed by both parties." Business Agreement at 1. Particularly where the language of the Business Agreement is more specific on how the two agreements relate to each other, the only reasonable reading of these provisions together is that the Integration Clause of the Lease was not intended to prevent the provisions of the Business Agreement from applying to the Lease.

9

Further, as in *Jaguar Land Rover*, when read together, the provisions of the two documents do not actually conflict. While the Lease sets out the terms of the landlord/tenant relationship between the parties and sets the lease payment terms, the Business Agreement is most fairly read as addressing different future scenarios and adjustments to the arrangements that may have needed to occur depending on whether Alliance was awarded the DISA contract. The Indemnification Clause does not directly contradict the Lease's payment terms or eliminate Alliance's obligation to pay rent; rather, it requires First Flight effectively to reimburse back to Alliance any amounts it is later deemed to owe under the Lease. The Court therefore finds that the plain language of the two contracts unambiguously permits the application of the Indemnification Clause. Even if the provisions were considered to be ambiguous so as to permit consideration of extrinsic evidence, the Court reaches the same conclusion based in part on Hayes's explanation of the adoption of the Indemnification Clause, which is not contradicted by any testimony or evidence offered by First Flight, as part of an effort to demonstrate rental income to M&T Bank for purposes of the refinancing and spreading to First Flight the risk of a failure to secure the DISA contract. Hayes Aff. ¶¶ 6-7, Mot. Summ. J. Ex. 5, ECF No. 174-5. Thus, the Integration Clause does not supersede or cancel the terms of the Business Agreement.

First Flight's reference to the language of the Tenant's Agreement, which states that Alliance agreed that "[t]here have been no modifications of the Lease" and Alliance "has no defense, set-off or counterclaim against [First Flight] under the Lease or otherwise," is unpersuasive. Tenant's Agreement ¶ 2. First, on its face, First Flight was not a party to the Tenant's Agreement, which was an agreement signed by Alliance only and was to be provided to M&T Bank. Furthermore, even if the terms of the Tenant's Agreement were to be considered part of the Lease, the cited provisions do not constitute an additional integration clause. When the

10

Tenant's Agreement is considered as a whole, Alliance's statements represent only that Alliance was confirming to M&T Bank, for purposes of providing M&T Bank with information it sought in order to decide whether to grant a loan to First Flight, that as of the date of the Tenant's Agreement the Lease was in effect and Alliance had no existing legal claims against First Flight that would impact First Flight's ability to repay the loan, not that it could never bring a claim against First Flight in the future based on the Business Agreement or otherwise.

Accordingly, based on the plain language of the Indemnification Clause when read in conjunction with the full Business Agreement and the Lease, the Court finds that Alliance is entitled to summary judgment on Count 1 of its counterclaim. In turn, because any recovery by First Flight for unpaid lease payments would immediately be canceled out by Alliance's indemnification counterclaim, the Court will grant summary judgment to Alliance on First Flight's breach of contract claim as well.

## III. Recoupment and Set-off

"Recoupment is the right of the defendant to have the plaintiff's monetary claim reduced by reason of some claim the defendant has against the plaintiff arising out of the very contract giving rise to the plaintiff's claim." *First Nat'l Bank of Louisville v. Master Auto Serv. Corp.*, 693 F.2d 308, 310 n.1 (4th Cir. 1982). Such a claim seeks "a diminution or a complete counterbalancing of the adversary's claim based upon circumstances arising out of the same transaction on which the adversary's claim is based." *Imbesi v. Carpenter Realty Corp.*, 744 A.2d 549, 552 (2000). Set-off is a counterclaim seeking such "a diminution or complete counterbalancing of the adversary's claim based on upon circumstances arising out of a transaction other than that on which the adversary's claim is based." *Id.* Because this Court has found that the Lease and the Business Agreement are all part of a single transaction, and based on the

11

Indemnification Clause, Alliance is entitled to recoupment rather than set-off, and in the same amount as any unpaid lease payments. Accordingly, the Court will grant summary judgment to Alliance on Count 2 of the Counterclaim, recoupment, and will deny it on the set-off claim in Count 3.

## CONCLUSION

For the foregoing reasons, Alliance's Partial Motion for Summary Judgment will be GRANTED IN PART and DENIED IN PART, in that the Motion will be granted in favor of Alliance on Counts 1 and 2 of its Counterclaim and on First Flight's breach of contract claim and will be denied on Count 3. The result of the resolution of these claims is that neither party is liable to the other for any net financial obligations arising from the payments required by the Lease. The remaining claims in this case are therefore Count 4 (detrimental reliance) and Count 5 (unjust enrichment) of Alliance's Counterclaim. A separate Order shall issue.

Date:   May 9, 2023

THEODORE D. CHUANG
United States District Judge